In General Term—November 1854.

Before Judges STORER, SPENCER, and GHOLSON.

### ELLIS & MORTON *vs.* THE OHIO LIFE INSURANCE & TRUST Co.

A motion to arrest the evidence in any case from the Jury, and to grant a *non-suit,* necessarily assumes the fact, that upon the case as presented, there can be no recovery by the plaintiffs.

There is an admission also, in such motion, that the testimony, offered by the plaintiffs, is true, and taking it as true, there is no ground to sustain the action.

If there is doubt as to the facts proved; if the credibility of witnesses is called in question; if there is a dispute as to any material part of the testimony, a Jury is the proper tribunal to decide the controversy.

But where, as upon demurrer to evidence, all the matters in evidence are held to be fully proved, and the only real question can be the application of the law to those facts, it is not only within the power, but it is the duty of the Court to take the responsibility, and direct or refuse a non-suit as in their judgment shall be right and proper.

A party, who pays a check or draft drawn upon him, is estopped from denying the genuineness of the drawer's signature.

The only exception to this rule is: when the party, who holds the check or draft, has been guilty of fraud; or such gross negligence as would be equivalent to fraud.

When payment of a forged bill or check is once made by the drawee, the party, to whom the payment was made, is entitled to notice of its invalidity the same as the endorser of a bill of exchange.

This cause came up to the General Term on error. The Judges delivered their opinions seriatim.

SPENCER, J.

This was an action brought by the plaintiffs in the Court below, to recover for money, alleged to have been paid by the plaintiffs to the defendants' use, at their request; and for money alleged to have been had and received by the defendants, to the plaintiffs' use. It appears from the bill of exceptions made part of the record, that the plaintiffs introduced, upon the trial of the cause, divers witnesses, who testified to the effect, that on the morning of the 14th December 1852, an unknown person, in the garb, and having the appearance of a drover, presented himself at the paying teller's counter of the banking house belonging to defendants, in Cincinnati, shortly after the opening of the bank, and proposed purchasing a large amount of Kentucky funds or gold, both, at that time, bearing a small premium, (and of the latter of which the defendants had a liberal supply, laid in for the purpose in part of accommodating dealers in pork at this season,) exhibiting at the same time two cash checks, one purporting to be drawn by Evans & Swift, pork dealers of Cincinnati, upon the banking house of Ellis & Morton, likewise of said city, and whose place of business is situated near to that of the defendants, for the payment of $7,500; and the other by Davis & Co. also pork dealers in said city, upon the Mechanics' and Traders' Bank, whose office is likewise near

to that of the defendants, for the payment of $7,300. The proposition was communicated by the teller to the cashier, and the checks also shown him; and thereupon it was concluded to make the exchange in gold, at a premium for the latter of one quarter of one per cent, which was done accordingly; the gold delivered; and the checks received in payment, as so much cash. No suspicion, in fact, existed in the minds of the officers of the bank, as to the genuineness of the checks, or the ownership by the party presenting them, or their sufficiency in any other respect. The drawers were in good standing, and known to have heavy business transactions at that season of the year, involving the use of large sums of money, and the necessity of making heavy payments. No inquiry whatever was made into the ownership of the checks, or their genuineness, or sufficiency; but they were received upon the sheer judgment of the bank officers, that all was right.

Shortly afterwards, say between 10 and 12 o'clock of the same day, the check supposed to be drawn by Evans & Swift upon the plaintiffs, was placed by a clerk of the defendants in a bundle, with several other checks drawn upon the plaintiffs by divers other persons, amounting in all to the sum of $10,000, pinned together with a slip of paper containing figures only, setting forth thier *respective amounts*, and the *aggregate* of all, but without stating the names of the drawers; and in this manner the whole were presented for payment at the counter of the plaintiffs. The aggregate sum, thus stated on the slip, was at once paid over to the defendants' clerk, without the bundle being opened, or in any wise separated, and without any examination being made, at the time, of its contents. This mode of presenting, receiving, and paying checks

was usual and mutual, between the plaintiffs and defendants; and it was equally usual and mutual to correct any mistake or wrong payments made by either; of which, notice might be given to the other, on the same day when made, or, at all events, not later than the morning following. The same usage prevailed, to a certain extent, among others of the city banks, but not universally. After the close of bank hours, on the same day when payment was made, the bundle of checks referred to was examined by one of the posting clerks; the checks found to correspond severally with the amounts specified on the slip of paper attached to them; and were charged up to the parties from whom they were supposed to emanate. Evans & Swift had *then* a sufficient deposit with the plaintiffs to meet their check. No other, or special examination of the checks, appears to have been made, with a view to ascertain their authenticity. On the 24th day of the same month, the plaintiffs having discovered that the account of Evans & Swift with them was overdrawn, sent for their *bank book*, and entered therein the amount of checks drawn by them, and their checks were then returned to them. Upon an examination of these checks by Evans & Swift, the check which was the subject matter of this action was discovered to be a forgery; the fact at once communicated to the plaintiffs; and by the latter to the defendants without delay; accompanied by a notice, that they were expected to refund the money paid on the check. After taking a brief time to consider, the defendants refused to pay; and in consequence of such refusal, this action was brought by the plaintiffs to recover the amount.

It was further testified by some of plaintiffs' witnesses, who are tellers and bankers' clerks, and among them, by

Matthews, the receiving teller of the defendants, that they would not have taken so large a check from a stranger, upon another bank, without sending to see if it was good; whilst others stated that there was no rule upon the subject, but that each case was to be governed by its own circumstances. So far as any usage of the defendants themselves was concerned, there was no departure from it in the present instance; they having frequently taken checks payable to bearer, drawn on other banks, from persons unknown, for the purchase of gold. Other facts were proven, rather going to excuse the defendants; but not tending to strengthen the plaintiffs' case.

Upon the closing of the plaintiff's testimony, the defendants moved for a non-suit, on the ground that such testimony was not sufficient to support the plaintiff's declaration. The motion was granted, and judgment entered accordingly; to reverse which, the present petition is exhibited.

Two grounds are relied upon to reverse the judgment:

I. That the Court had no power to order an involuntary *non-suit*.

II. That, if the Court had the power, it was not properly exercised.

1. Because upon all the facts proven, the plaintiffs were entitled to a judgment.

2. If not upon *all the facts*, yet sufficient facts were proven on behalf of the plaintiffs, to entitle them to a judgment; and although other facts may have come out on the testimony of the plaintiff's witnesses to rebut the plaintiff's case, he had a right to submit his case to a jury, to determine whether the rebutting facts were sufficiently proven to set aside his *prima facie case*.

1. Upon the first of these propositions, I agree with my colleague who decided this case below, "that at this period "of our judicial history, the power to grant a non-suit can- "not be seriously questioned." True it is, as contended for by the counsel for the plaintiffs, that the right is denied in the Courts of the United States, and in many of the State Courts. But it is equally true, that the power is exercised *sub modo* in England, and in those States of the Union, whose jurisprudence and decisions we are most conversant with, and most usually follow; and what is more to the purpose, it has always been liberally exercised in our own Courts—Insomuch, that not a term elapses in any of our Courts, without its being called into frequent exercise; and so far as I know, without question, until *now*. Without being expressly given, the power has been taken for granted in our legislation; as will be seen by the 96th Section of the old practice Act, *Swan* 676, (old ed.) which recognized it in those classes of cases. 1. When the plaintiff's testimony is irrelevant to the issue. 2. *Insufficient* to support his declaration. 3. Withdrawn by the Court from the consideration of the jury. It seems like a useless task to vindicate the exercise of a power so universally allowed, and sanctioned by legislative recognition, from the charge of *usurpation*. And more especially, when it is considered, that the article in the bill of rights, which it is supposed to invade, viz: "the "right of trial by jury shall be inviolate," adopted in the new Constitution of our State, is an exact transcript of the same declaration in the old one, under which the power had before been constantly exercised. If, therefore, it had been supposed, that the exercise of the power in question, was in *violation of that article*, it is impossible to be-

lieve, that in the reconstruction of that instrument, and the adoption of that article, the power would not have been expressly denied.

But, it may be well asked, in what respect does the granting of a non-suit, upon the insufficiency of the plaintiff's own testimony, interfere with the right of trial by jury? Of what has the plaintiff to complain? The motion for its allowance, pre-supposes the truth of the plaintiff's evidence. But, what more can the plaintiff ask than that the testimony adduced by himself shall be taken as true, and his witnesses regarded as credible? When such is the case there is nothing for a jury to find, as is well said by Chief Justice Mellen in Perley *vs*. Little, 3 *Greenleaf* 99—"there is no privilege in a trial by jury to "establish facts which are admitted by all concerned, to be "true."

4. It is claimed that this power, in the present case has been improperly exercised. 1. Because upon all the facts proven, the plaintiffs were entitled to a judgment.

The elaborate opinion (now in print, and the subject of much comment in the argument at bar) given upon the trial of this cause by my learned colleague, renders it unnecessary to enter upon a critical examination of the authorities to sustain the various propositions, made and considered in the case. They establish satisfactorily, in the first place, that the acceptor or drawee of a bill or check, is bound to know the genuineness of the drawer's signature, as the maker of a note is required to know his own. When therefore the party acts upon such knowledge, so that rights are honestly acquired by other parties, he is estopped, or precluded in law from setting up his ignorance in fact, to prejudice the rights of others, thus acquired

through such ignorance. 2. This rule pre-supposes honesty and good faith, in him who receives the benefit of this alleged ignorance; so that it would be clearly not against *conscience,* to avail himself of the benefit thus acquired. But it requires nothing more on his part, than *honesty and good faith.* 3. It also pre-supposes that he has given *value* for the subject. For it would be clearly against conscience, for one to retain an advantage obtained even through the *culpable* mistake or ignorance of another, where he himself has lost nothing by it, but is only a *gainer.*

Apply these rules to the facts proven in the present case. The plaintiffs were the drawees of the check in question, and were *required to know* before acceptance or payment, whether the signature of the drawers was genuine or not. Having voluntarily made the payment, they were bound by it, unless the defendants, to whom it was made, cannot conscientiously retain it, by reason that the payment was wrongfully procured, or the check obtained by the defendants without parting with anything valuable for it, or under such circumstances as would render it dishonest to demand payment.

But the facts show, that the defendants purchased the check from the holder at its full value in money, supposing it to be *genuine* and *valid*; and under the same supposition presented it for payment and received the money thereon. In this there was clearly nothing dishonest or unjust; nothing but what the most scrupulous conscience might have allowed.

But, it is supposed that the present case falls without the general principles above laid down. 1. Because it is said the defendants received this check under such circumstances of *gross carelessness,* as to render their con-

duct *mala fide.* And 2. That by their manner of presenting the check for payment, the defendants represented it to be *genuine* and *valid,* and thereby prevented the plaintiffs from exercising that circumspection and care, in regard to its examination and payment, which they otherwise would have done. As to the first, it is enough to say, that in making the purchase of this check, the defendants were acting for *themselves,* in their own proper business, without any present expectation that any but themselves would be involved in the consequences of their act.

To say, that under such circumstances, their act could in any sense be *mala fide* towards the plaintiffs, involves a solecism. Even had this check been purchased by the defendants on joint account for the parties, it would with little propriety have been claimed by the plaintiffs that the purchase, as to their portion, was in *bad faith*; for they would not expect the defendants to take better care of their interests than they did of their own; unless they expressly stipulated for it. In the affairs of life, it is not usually expected that a man will take better care of another's affairs than he does of his own. And it is the best evidence of *good faith* when one deals for another, as he deals for himself.

2. As to the second proposition, the presentment of this check for payment, in a bundle with others, with a label attached specifying their amounts, was not such a representation of their genuineness and validity, as should have thrown the defendants off their guard, and excused them from examining for themselves. It was at most but a representation of the opinion of the defendants, of the facts supposed—not more so, than the *open presentment* of

the check would have been.   Independent of any custom, or usage, between the parties, by which the plaintiffs at the time of payment, were excused from an open examination of the checks presented, it would have been their duty at once to make such examination; and their neglect or refusal so to do, would necessarily be at their *own peril.*   Any other rule would put the plaintiffs in a better position by their own *carelessness,* than they would have occupied, had they exercised their *best judgment* in the matter, and taken their *best care* to avoid the evil.   If they had made the examination at the time, and failed to detect the forgery, it is conceded, that their payment of the check would have been their own loss, notwithstanding the manner of its presentment.   But it is said, that by the usage referred to, the defendants were at liberty to pay the checks upon the mere credit of the presentment; and might afterwards recall the payment, or treat it as if none had been made, if upon subsequent examination they should find the checks to be invalid.   So far as any such usage was proven, it was accompanied by the *condition,* that such examination should be made on the same day; or, at all events, not later than the following morning.   If not then made, the payment became *absolute.*   No mistakes were corrected afterwards.   This condition was not complied with in  the present instance, and the payment by its terms therefore became *absolute.*   The plaintiffs were no more at liberty to neglect making such examination, by the proper officer, than they would have been in the first instance, irrespective of the usage.   And indeed independent of the condition, it would have been their duty to make the earliest examination into the matter that their circumstances allowed; which should have been not later

than the time of charging up the checks. Gloucester Bank *v.* Salem Bank, 17 *Mass.* 45. Ten days was clearly too late. Neither is it of any consequence, as supposed by plaintiffs' counsel, that no harm is proven to have accrued to the defendants, by this delay. Harm will be *presumed* in law by the delay. *Ib.* Besides this, it is not a mere question of *harm,* but of *payment.* When is the payment to be considered absolute? It is when the *examination has been made,* or sufficient time elapsed to have made it. Payment *once made,* the rights of the parties become fixed by it; and though the forgery should be immediately afterwards detected, and made known to the party receiving payment, so as that no possible harm could come to him by delay, the notice would come too late; the rights of the parties have been already determined.

On the whole, therefore, I do not see how the plaintiffs in this case could have obtained a verdict upon the evidence, consistently with the rules of law.

This brings me to a consideration of the other, and only remaining question to be disposed of, and that is,

2. Supposing *upon all the facts proven,* the Court should be of opinion, that the plaintiffs ought not to recover, yet it is claimed that sufficient facts were proven on the part of the plaintiffs, to warrant them in putting their case to the jury; and where testimony is adduced, conducing to make out the plaintiff's case, the Court ought not to consider that which makes for the defendant, and so finding upon the whole testimony, that the case is with the defendant, withdraw the testimony from the jury, and thus force the plaintiff to become *non-suit*—but should leave the case to the jury, to determine for themselves.

If this be conceded to be the true rule, then I do not see but what the Court erred in granting this *non-suit.* Irrespective of so much of the proof as tended to exculpate the defendants, or rather to *inculpate* the plaintiffs, the plaintiffs' testimony, taken wholly on its own side, certainly did conduce to prove the issue on his part. What did it establish ? That the defendants had obtained the plaintiffs' money upon a forged check. This would have entitled the plaintiffs to a recovery, but for the fact that he was the drawee of the check, and therefore was presumed in law to be acquainted with the handwriting of the drawers; and so paid the money in *his own negligence.* But this presumption was rebutted by further proof, that this check was not examined *in fact* at the time of its payment—and that such examination was omitted, in consequence of a usage, or understanding between the parties, that when checks were presented in a bundle, as was here done, and payment made thereon, such payments were to be recalled, or corrected, if upon subsequent discovery they were found to be mistaken. True, the *time* for correcting such mistakes, was limited by the understanding to the same day, or to the morning following. But, if this part of the evidence, which makes for the defendants, be left wholly out of view, then the time would be such as in law is deemed reasonable; and what *is* reasonable, must depend upon circumstances to be further found by the jury.

I am not inclined however to adopt the rule to the extent claimed by the defendant's counsel—but think the whole of the plaintiffs' testimony may justly be regarded on a motion for a *non-suit.* Of this the plaintiff has nothing to complain. He cannot object that his own tes-

timony is taken as *true,* and his own witnesses regarded as *credible.* Indeed, he is forbidden to deny their credibility. This necessarily supposes there is no contradiction in the testimony; for if the testimony be contradictory, it cannot all be admitted to be true; if not *all* true, judgment must be exercised in separating the true from the false; and this is the peculiar province of the jury.

A motion for a *non-suit,* is in some respects like a demurrer to evidence, and a substitute for it. Like the latter, it admits the plaintiffs' testimony to be all true, and such inferences as may be legitimately drawn from it; but it differs materially in this, that the demurrer when properly presented, is *stricti juris,* and the judgment upon it is *final,* either for the plaintiff or defendant. Not so of a motion for a *non-suit.* The decision upon it is in no case *final* so as to *conclude* the right of either party; and the granting or refusal of it is purely discretionary. Hence much greater latitude is allowed in the consideration of the motion, than is allowed upon demurrers to evidence. I am not sure that there is not another distinction. The *demurrer* admits the *fact* sought to be established; whilst the motion only admits the *evidence* of the fact. The fact, that the judgment upon the demurrer to evidence is *final,* and the greater strictness required in stating, and admitting the facts demurred to, have occasioned it to go almost, if not entirely, out of practice; and the motion for *non-suit,* which admits of greater latitude, has usurped its place. In this State, I am not aware, that a demurrer to evidence has ever been taken, or attempted; whilst the motion for a *non-suit* is of daily occurrence. But, without endeavoring to trace further, the analogies and distinctions existing between the *demurrer* and the motion, I think it

will be found, upon an examination of all the authorities, that where the testimony is all offered on the side of the plaintiff, and it admits of *no contradiction*, that in a motion for a *non-suit*, *all* of the testimony must be considered; as as well that which makes for the defendant, as that which makes for the plaintiff.

In Kentucky, it has been held, even in a *demurrer to evidence*, that facts which have been elicited upon cross-examination, will be considered.   3 *Marshall* 277.—And in the late case of Gregory *vs.* Nesbit, 5 *Dana* 419-21, which was a motion for *non-suit*, the Court say, "the "motion is in the nature of a demurrer to evidence; and "when·the evidence is all on the side of the plaintiffs, and "is not *contradictory, or doubtful*, it should be indulged. "In such motion, all the facts proven should be taken as "*true*, as well as every rational deduction which a jury "could indulge against the defendant." So, if the matters of defence arise upon *cross examination*, (422).   The plaintiff cannot impeach his own witnesses from what they testify on *cross examination*; their introduction is an admission of their *credibility*, (422).   Taking their statements on *both* sides as *true*, the question may well be made by motion to the Court, whether the *law* is for the plaintiff, or for the defendant, (422).

So in Martin Davis *v.* Green, 9 *Shep.* 256, the Court say, "Where a *non-suit* is moved, *all* the testimony is re- "garded as *credible*, and the facts stated in the testimony as "*true*.   And when there is no longer any dispute as to facts, "whether a party is entitled to recover upon such a state "of facts, is a question of *law*; as clearly so as upon a *spe- "cial verdict*.

In New York, the rule is carried still farther.   There,

a *non-suit* has been ordered, after testimony on *both sides.* Rudd *v.* Davis, 3 *Hill* 287–8. The Court say, *p.* 288, "it is "enough that a verdict for the plaintiff would be against "the *clear weight and effect* of the *defensive* evidence, what- "ever may be its character." So also, Scott *v.* Simpson, 1 *Sandf.* 601—where it was held, that "in an action for "malicious prosecution, when the plaintiff, after introducing "testimony going to show *want* of probable cause, intro- "duced two witnesses, who testified to facts, showing that "there *was* probable cause," *non-suit* was ordered.

This last case is in accordance with the case of Davis *v.* Hardy, 6 *Barnwell & Cresswell,* 13 *Eng. C. L.* 152, which went a point further. This was also a case of *malicious prosecution.* After plaintiff had shown want of probable cause, the defendant introduced a witness, who testified to a *new* fact, which showed probable cause. The Court, Chief Justice Abbott, said, "as the new testimony was "uncontradicted, and the witness was *unimpeached,* and no "incompatibility in his statement, the judge was not "bound to leave his *credit to the jury*; but to take the facts "as proven, and act accordingly." So in Massachusetts, in the case of the Salem Bank *v.* The Gloucester Bank, 17 *Mass.* 33, a *non-suit* was ordered. That case was in many of its *essential* particulars, like the case before us; and especially upon the point of the *receipt* of the *notes* in *payment*; and the case was decided, as well upon the *defensive evidence,* as upon *that of plaintiff.*

And in the earlier case of Hoyt *v.* Gilman, 8 *Mass.* 336, which was an action on a policy of insurance; on the trial, the policy and the loss were admitted. On the part of the plaintiff, it was admitted, that before effecting the policy, he had received a letter, which contained informa-

tion material to the risk. The defendant then called a witness, (the insurance broker) who testified, that he had inquired of the agent applying for insurance, if any information or letter had been received from the ship—to which the agent replied, he knew of none. The *plaintiff* then called the *agent* as a witness, who among other things testified, that he had no recollection of any inquiry touching the letter, or information referred to. Upon the whole case, a *non-suit* was ordered. Although, as it appears, testimony was heard on both sides.

How long the practice of granting new trials has existed in this State, I have not been able with certainty to learn—but I presume from the earliest organization of the Territory. Its existence in cases of *involuntary* non-suits was recognized by statute in 1813, and has ever since then been so recognized. The law of 1831, in conformity with which the practice continued, after its repeal by the law of 1845, *Swan's St. old ed. p.* 676, recognized the propriety of an *involuntary non-suit*, in three classes of cases. 1. When the testimony was *irrelevant*. 2. Where the testimony did not support the case set forth in the declaration. 3. Whenever (for any cause) the testimony should be arrested from the jury. The law of 1845 dropped this classification of cases; and confined itself to a statement of the third or last class only. Since it was obvious that this was comprehensive enough to include both of the others; and since the passage of this latter law, (as before remarked,) the same practice has been observed as before. To the *second*, (and *not* to the *first*,) of the above classes, clearly belongs a case where the plaintiff has exhibited testimony, *conducing* to prove his declaration, but not sufficient to *establish* it; for where the

testimony does *not* conduce to prove the declaration, it is a case of irrelevant *evidence,* and falls within the first class.

In the 3d of the above classes belongs, as I regard it, a case like that under consideration. Where upon the *whole evidence,* as exhibited by the plaintiff himself, there appears to be no just foundation for a verdict in his favor, and the whole "testimony is therefore arrested from the jury." Indeed, I do not see to what kind of case this third class can be held to apply, unless to one like the present. Certainly, not to a case, where the plaintiff's proof is *irrelevant*—for that is already provided for, under the *first* class—nor to one where the plaintiff's proof "fails to establish his case," for that is provided for under the second class of non-suits.

Upon the whole, I am content to abide by the rule, as laid down by my colleague in the trial of the cause, believing it is not only in consonance with the settled practice in Ohio, but that it does not unreasonably trench upon the right of trial by jury.

GHOLSON, J.

This case has been brought before us on a bill of exceptions to the order of the Judge, sitting at the Special Term, directing what, according to a practice which has prevailed in this State, is termed a peremptory non-suit; and a question is presented, and pressed very earnestly on our consideration, whether a judge, after a case has been submitted to the jury, has the power to compel a plaintiff, against his consent, to become non-suit.

If this question were presented to me on general principles, unaffected by the practice, decisions, and legislation of the State, I should feel but little difficulty in deciding

against the existence of any such power. If the question were to arise for the first time in a State, proceeding according to the course of the common law, the weight of authority is plainly opposed to any such practice. (See Minchen *vs*. Clement, 1 *B. & Ald.* 252; Dewar *vs*. Pinday, 4 *Nev. & Man.* 633; Corsar *vs*. Reed, 8 *Eng. L. & E. R.* 380.) But the question is not so presented, and, looking at the practice on this subject in Ohio, as it has undoubtedly existed for a number of years, and the recognition which it has received from the decisions of our highest tribunal, and from legislative enactment, I feel bound to say, such a power does exist.

A statute was enacted, as early as the 4th of February, 1813, (2 *Chase* 794,) which must either have been predicated upon a then existing distinction, or which at once created a distinction, between voluntary and involuntary, or peremptory non-suits. That statute provides, expressly, for the right to except to the opinion of the Court, directing a non-suit. It gave the right of appeal in all cases .of non-suit, directed by the Court, by reason of irrelevancy of testimony, or by reason that the testimony adduced did not support the case set forth in the declaration, but a different one ; and, also, whenever the testimony might be arrested from the jury, by reason of which the plaintiff became non-suit. This enactment was substantially followed in the subsequent revisions of the Practice Act, and in the present law regulating appeals to the District Court.

In the case of Bradley *vs*. Sneath, 6 *Ohio* 490, it is said : " Will an appeal lie from a voluntary non-suit ? The Act of Assembly (29 *O. L.* 75,) provides for an appeal, when the Court order a non-suit, by reason of the irrele-

vancy or insufficiency of testimony to support the plaintiffs' declaration and where a non-suit results from the Court's arresting the testimony from the jury. All these cases, which are exceptions to the common rule, suppose the interposition of the Court. This is essential to the appeal."

There cannot be any better or higher authority in Ohio to sustain the distinction between voluntary and involuntary non-suits, and the numerous cases on the subject in *Wright's Reports,* need not be cited. The Court may, in certain cases, according to the practice in this State, order a peremptory non-suit. The next and more important enquiry is, in what cases may this be done? If the enactment of the legislature which has been cited, be considered sufficient to establish, either directly or by recognition, the practice of ordering what are termed peremptory non-suits, then the same enactment should, by its express enumeration of certain classes of cases in which a non-suit may be ordered, be deemed a sufficient authority for the exclusion of any others. It must be considered that the Legislature intended to extend the right to appeal, and to except, to every case in which a non-suit was the result of the interposition of the Court, and as the cases in which such right may be exercised are limited by the statute, so must be limited the power to order a non-suit.

If this view be correct, the question then becomes one of construction; but such is the general character of the language used in the statute, that the difficulty of its solution is in no respect diminished.

The statute appears to provide for three classes of cases. It will be more convenient to consider them in an order different from that in which they are enumerated in

the statute. As to the second class, the cases which it will embrace are those in which there appears what is technically called a *variance*. What is alleged and what is proved do not agree. A case may indeed be fully made out in proof, but it is not *the case* stated in the pleading. The Court, therefore, orders a non-suit.

In the first and third classes, a non-suit is the result of there being *no case* made out. In one, because, though testimony be offered, it is irrelevant—has no proper connection with the matter stated or the point in issue. In the other, because, though testimony has been given, it is *arrested from the jury.*

It is obvious, that in each class of cases, the *non-suit* is the consequence of the opinion of the Court, that the testimony offered or given by the plaintiff does not legally make out the claim he has brought forward, or establish the issue between him and the defendant. It is equally obvious, that in each class of cases, the order of *non-suit* has the effect of arresting the evidence from the Jury. The whole effect of the statute and the practice is, that in two enumerated cases, and in such others as the principles of law, and particularly those prescribing the province of the judge and jury, will warrant, the evidence may be arrested from the jury, and there being no evidence on which to predicate a verdict, the plaintiff becomes *non-suit* by order of the Court.

To determine in what cases a judge will be warranted in arresting the evidence from the jury, we are not left without a guide. It was a well known proceeding at Common Law, accomplished by what is called a demurrer to evidence, for which, in the practice in Ohio, I consider a motion for a non-suit to be the substitute. A demurrer

to evidence, as well as a non-suit, takes from the jury the consideration of the evidence offered in the case. The great difference is, that in the former the decision of the Court may be final between the parties, but cannot be so in the latter. And, it will therefore be sufficient to apply to the latter, the same rules and restrictions which are intended to guard against any infringement upon the right of a trial by jury, which have been established in respect of the former.

The general principles on this subject are very clearly laid down by Eyre, C. J. in delivering the unanimous opinion of the judges to the House of Lords in Gibson *vs*. Hunter, 2 *H. Bl.* 187, 205. "In the first stage of that process, under which facts are ascertained, the judge decides whether the evidence offered conduces to the proof of the fact which is to be ascertained; and there is an appeal from his judgment by a bill of exceptions. The admissibility of the evidence being established, the question *how far* it conduces to the proof of the fact which is to be ascertained, is not for the judge to decide, but for the jury exclusively, with which judges interfere in no case but where they have in some sort substituted themselves in the place of the jury in attaint, upon motions for new trials. When the jury have ascertained the fact, if a question arises whether the fact thus ascertained maintains the issue joined between the parties, or, in other words, whether the law arising upon the fact (the question of law involved in the issue depending upon the true state of the fact,) is in favor of one or other of the parties, that question is for the Judge to decide. Ordinarily he declares to the Jury what the law is upon the fact which they find, and then they compound their ver-

dict of the law and fact thus ascertained. But if the party wishes to withdraw from the jury, the application of the law to the fact, and all considerations of what the law is upon the fact, he then demurs in law upon the evidence, and the precise operation of that demurrer is, to take from the jury and refer to the judge the application of the law to the fact."

It was held in that case, that the evidence could not be arrested from the jury, so as to allow the Court to pass its judgment on the case, " without distinctly admitting on the record, every fact, and every conclusion which the evidence given for the plaintiff conduced to prove."

In the case of Cocksedge *vs.* Fanshaw, 1 *Dougl.* 119, it is said by Lord Mansfield, that by a demurrer to evidence, " the defendant admits every fact which the jury *could* have found upon the evidence."

The decision in Gibson *vs.* Hunter is referred to and adopted by the Supreme Court of the United States, in Fowle *vs.* The Common Council of Alexandria, 11 *Wh.* 320 ; and in the case of Thornton *vs.* the Bank of Washington, 3 *Peters* 36, it is said by the same Court, " The party who demurs to evidence, seeks thereby to withdraw the consideration of the facts from the jury, and is therefore bound to admit not only the truth of the evidence given, but every fact which that evidence may legally conduce to prove in favor of the other party."

The subject of demurrers to evidence was very fully considered, and the authorities examined in the case of Copeland *vs.* New Eng. Ins. Co. 22 *Pick.* 135 ; in which case a very important distinction is pointed out, that appears to have been disregarded in other cases. It is said, in that case, speaking of the effect of a demurrer to evi-

dence, " It seems to have been supposed to be an admission of the truth of the evidence; and the Court have been called upon, supposing it all to be true, to determine what inferences may be drawn from it, and whether it would be competent for the jury upon it to find a verdict for the plaintiff. And it has been argued, that if we would set aside a verdict found for the plaintiffs on this evidence, we must render judgment for the defendants, on the demurrer. But we think this is a mistaken view of the subject, and fails to give the demurrer its legal effect. It leaves it to the Court to draw inferences from the circumstances proved, and to judge of the weight of the evidence, which would be trenching upon the province of the jury. The effect of a demurrer to evidence, is not only to admit the truth of the evidence, but the existence of all the facts which are stated in that evidence, or which it conduces to prove." The true question always raised by this kind of demurrer is, not what it is competent for the jury to find, but what the evidence *tends* to prove." " The result of these authorities is, that a demurrer to evidence admits not only all the facts directly stated in it, but also all the facts which the evidence in any degree *tends* to prove."

In opposition to this view of the effect of a demurrer to evidence, may be cited Hansbrough *vs.* Thom, 3 *Leigh* 147, 159, in which case it is said by Tucker, president of The Court of Appeals: " I think the expression, that the demurrant must admit, or is considered as admitting, every fact which the evidence may *conduce* to prove," must not be understood too broadly. The language of this court is more appropriate; that the demurrant must be considered as admitting all that could *reasonably be inferred* by

a jury from the evidence given against him." For evidence may conduce, that is, tend or contribute towards the proof of a fact, which it is very far from establishing, and which could not be fairly inferred from it." The same idea is found in an earlier case in the same court. Stephen *vs*. White, 2 *Wash*. 203, 211. And it was, probably, in view of the Virginia practice as to demurrers to evidence, essentially variant from the English, (3 *Leigh* 157 ; 2 *Rand*. 357 ; 5 *Rand*. 4 ;) that Marshall, C. J. said, in the case of Pawling *vs*. the United States, 4 *Cranch* 219, " The party demurring admits the truth of the testimony to which he demurs, and also those conclusions of fact which a jury may fairly draw from that testimony. Forced and violent inferences he does not admit; but the testimony is to be taken most strongly against him, and such conclusions as a jury might justifiably draw, the Court ought to draw." So in the case of the Bank of the United States *vs*. Smith, 11 *Wheaton* 171, it is said : "By this demurrer the defendant has taken the questions of fact from the jury, where they properly belonged, and has substituted the court in the place of the jury, and every thing which the jury could reasonably infer from the evidence demurred to, is to be considered as admitted."

The contrariety of opinion which appears in the authorities I have cited, may have had its origin to some extent in overlooking the rule of pleading, "which is, not that the issue shall be joined on a single fact, but on a single point of defence," (41 *E. C. L. R.* 42, *Id*. 415). And "though it be that issue must be taken on a single point, yet it is not necessary, nor ever can be, that such single point must consist only of *one single fact*." Several facts may be put in issue amounting to only one proposition, and

it cannot be necessarily true, that one or more of the facts being proved, the proposition is thereby established. Nor when the authorities say that the party, who demurs to the evidence, must admit the facts which the evidence tends to prove, do they mean the issue or proposition that is to be maintained. It follows that a demurrer to evidence can only be properly tendered when the point in issue consists in several facts; and can only be successful, when there has been a failure to offer, or to have received by the Court, testimony tending to prove one or more of such facts. It is for the Court to decide, as a matter of law, what are the material facts in issue, and whether there be evidence relevant to the proof of each of those facts.

This view of a demurrer to evidence is shown in an extract from *Gould on Pleading,* cited in 22 *Pick.* 141. " The object of a demurrer is to bring in question on the record, the *relevancy* of the evidence on one side, and to make the question of its *relevancy,* the sole point on which the issue, in fact, is to be determined; that evidence is always relevant to any issue which it conduces *in any degree* to prove. And as its relevancy is the only point of which the Court can judge, it follows, that it can never be safe for a party to demur to evidence, which is clearly *relevant* to the whole issue, viz : which clearly conduces in any degree to prove the whole affirmative side of the issue."

The same contradiction which I have just been considering, is found in the authorities in respect to the practice of ordering a non-suit; and it is particularly observable in the decisions in Massachusetts and New York. In the latter State the idea of substituting the court in the place of the jury, and determining what conclusions may properly be drawn from the testimony, seems to have been

carried to a great extent. And, indeed, they have gone so far, under what they term their *modern practice*, as to order a non-suit after evidence has been offered on both sides, and this not on the weakness of the case made by the plaintiff, or in respect of any defect of proof on his part, but on the strength of the defence offered by the defendant. Rudd *vs.* Davis, 3 *Hill* 287–288, and cases cited 7 *Hill* 529.

In Massachusetts, on the contrary, the same principles laid down in 22 *Pick.* 7, in respect to a demurrer to evidence, have been applied on motions for a non-suit. Wilkinson *vs.* Scott, 17 *Mass.* 249–258; Rose *vs.* Learned, 14 *Mass.* 154.

And the same rule governs in several other States. Davis *vs.* Steiner, 14 *P. St. Rep.* 275; 1 *Cush.* 23 *Miss. Rep.* 292.

After the review which I have made of some of the authorities, on the question of arresting evidence from the jury, I need scarcely add, that I concur in the principles stated in 2 *Henry Blackstone*, and explained in 22 *Pickering*, that, in my opinion, wherever there is anyevide nce, however slight, tending to prove the facts essential to make out a case for the plaintiff, a non-suit cannot be properly ordered ; that it is in no case a question as to the weight, but as to the relevancy of the testimony. If the testimony tends to prove a *prima facie* case for the plaintiff, a non-suit cannot be properly ordered. Nor can facts tending to prove a defence on the part of the defendants, though proceeding from witnesses introduced by the plaintiff, be considered on a motion to non-suit. If the defendant wishes to set upany such facts, he must resort to the jury to have them established.

Having thus stated the rules by which I think the propriety of the non-suit in the present case must be tested, it remains for me to inquire what were the facts essential in point of law, to establish the case proposed to be made out for the plaintiffs, and whether there was any evidence tending to prove those facts.

The action in this case, which is brought under the common counts in assumpsit, has been termed an equitable action. Money has been received by the defendant, which the plaintiffs claim justly and rightfully belongs to them, and which the defendant cannot in good conscience retain. Now, though the form of the action be general, the plaintiff must establish a state of facts, which in point of law, leads to that conclusion.

It appears that, on the 14th day of December, 1852, the plaintiffs had in their possession $7500 of their own money,—that on the same day this sum of money was paid to the defendant, on the presentation of a check for that amount, drawn on the plaintiffs, who were bankers, by one of their customers or depositors, and payable to bearer. The money thus passed from the possession of the plaintiffs into that of the defendants. By the present action, it is sought to recover it back, and the plaintiffs have introduced testimony to make good such a claim.

They prove that this check was forged, of which they were ignorant at the time of its payment. And here the question arises, and it is an important one, as to the propriety of the non-suit, whether, had the plaintiffs, gone no further, they would have established a *prima facie case?*

The principle on which the acceptor of a bill of exchange is bound to pay, though it is discovered that the signature

of the drawer be forged, is, that he is estopped to deny the handwriting, and the recovery is had against him as if it were a valid bill. If the bill be held valid for the purpose of a recovery, it must be for the other purposes of the suit ; and as it would be unjust to require the acceptor to pay a forged bill to a holder, who had given no value for it, the acceptor would be allowed to require proof to that effect from the holder, and for such purpose to show that there had been illegality in the concoction of the bill. And the proof of the forgery might well be offered for this purpose, not in denial of the handwriting, but to throw on the holder, the burthen of proving that he had taken the bill in the usual course of business, and for value.

The payment of a check purporting to be drawn on a banker, and payable to bearer, has the same effect to estop the banker, from denying the signature of the drawer of the check, that is given to the acceptance of a bill. I consider that the authorities establish that proposition. Now, the rule which is applied for the purpose of shifting the burthen of proof in an action on an accepted bill, cannot properly apply, where the position of the parties is reversed. The payment of the check must be considered as admitting, not only the signature of the drawer, but the *prima facie* title of the holder. So the holder of an accepted bill, who, while he continued holder, merely, might, in an action on the bill, have had thrown upon him the burthen of proving that he was a *bona fide* holder for value, could not be placed in that position after payment of the money. In either case, to recover back the money, the plaintiff must prove affirmatively his title to it, as against the defendant. The fact that the bill or check was

forged, does not in itself give a right to recover the money back—it may be so, and yet the plaintiff may have no title to the money. Indeed the plaintiff, by the policy of the law, for such a purpose alone, is estopped from proving that the signature of the drawer of the bill or check was forged. That fact of itself avails nothing, and is, in truth, only introductory to the proof of other facts impeaching the title of the defendant.

There was a time, when it was considered that a person could not receive a check, or even a bank bill of a large amount, without making proper enquiry as to the title of the holder, and in case of any subsequent dispute on the subject, it was left to the jury to consider whether proper diligence had been used; but I do not understand such to be now the law.

In the carefully considered case of Gibson *v.* Minet, 1 *H. Bl.* 607, it was said by Eyre, C. B. speaking of a bill of exchange, "The wit of man cannot devise any thing better calculated for circulation. The value of the writing, the assignable quality of it, and the particular mode of assigning it, are created and determined in the original frame and constitution of the instrument itself; and the party to whom such a bill of exchange is tendered has only to read it, need look no further, and has nothing to do with any private history that may belong to it. The policy which introduced this simple instrument demands that the simplicity of it should be protected, and that it never should be entangled in the infinitely complicated transactions of particular individuals, into whose hands it may happen to come. Hitherto that policy has prevailed."

And it did prevail, until the decision in the case of Gill *v.* Cubitt, and other kindred cases. Those decisions have

been swept away, and the negotiability of bills of exchange now stands on its former footing.

Without reviewing the numerous decisions on the subject, it may be safely stated, that independent of any agreement, there are two facts which might be established in such a case as the present, either of which connected with the proof of the forgery, would make out a case for the plaintiff. 1. That the defendant was a holder without having given value. 2. That he was a holder in bad faith. For I suppose it to be good law that a man may have given a valuable and indeed full consideration, for a bill, and yet not be a *bona fide* holder. Though such a case is not likely to occur. Partridge *vs.* Bank of England, 9 *Q. B.* 58, *E. C. L.* 426.

The proof offered by the plaintiff, as to the first fact, clearly established, that the defendant was a holder for value. The check was taken at its counter, and the full value for it was paid in cash. This proof rendered it much more difficult for the plaintiffs to exhibit any testimony, tending to show bad faith in the defendant. The fraudulent act in this case was the making and uttering a false and forged check, and I cannot see how the defendant can be connected with the fraud, and held to have acted *mala fide*, except by some proof of a participation by its agents in, the forgery, or a knowledge on their part that the check was not genuine. I do not understand any part of the testimony as tending to either of these conclusions, or that it was claimed to have any such tendency. And without some testimony tending to implicate the defendant with the fraud, I do not think the plaintiffs could recover, in this aspect of the case.

I have now to consider the effect, of what is said to be

a custom, or understanding, between the plaintiffs and de-
fendants, as to the examination and return of checks, and
the paying the forged check with others, on the presenta-
tion of a ticket showing the amount of each check, and
the aggregate of the whole.

It is claimed, on the part of the plaintiffs, that the
mode in which the check was presented, amounted to a
representation or warranty of its genuineness.   If it did,
it must have been the result of some previous agreement
or understanding, between the parties.   As the law im-
poses no liability as guarantor on the holder of a check
who presents it for payment, but, on the contrary, pre-
scribes as the rule, that it is the duty of the banker to
know the signature of his customer, the mere presenta-
tion of the checks, in an envelope showing their amount,
would not of itself establish such a proposition.

Admitting that there was an agreement in the strong-
est terms in which any of the witnesses speak of a custom
or understanding, in relation to the return of checks, it
is clear, to my mind, that the plaintiffs have entirely failed
to bring themselves within the terms of that agreement.
Had an action been predicated upon it, (and this part of
the case might, perhaps, be disposed of, by saying that a
special count would be required,) an averment of a return
of the check, on the same day, or, at furthest, on the
next, would be requisite.  There is no proof to sustain
such an averment.   In a court of law, where the time for
the doing of an act is expressly prescribed, it is always
deemed material.   In any court, time in respect to the
matter under consideration, would, I think, be deemed
material.   It would be considered sufficient, that the party
might be injured by the delay; no court should, in oppo-

sition to the stipulation in the agreement, enter into an enquiry whether he had been injured.

In either aspect of the case, I have come to the conclusion, that it was not made out on the part of the plaintiffs, and that the judgment must be affirmed.